WO                                                                                          **LMH**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Allen E. Elmore, | )  No. CV 05-1222-PHX-MHM (LOA) |
| Plaintiff, | ) **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |
| vs. | ) **and** |
| Dora Schriro, et al., | ) **ORDER TO SHOW CAUSE** |
| Defendants. | ) |

Plaintiff Allen E. Elmore, a former state prisoner, brought this civil rights action regarding his medical care for heart trouble. Defendants Schriro, Trujillo, Sloan, Vinluan and Kanter moved for summary judgment, Plaintiff responded, and Defendants replied (Doc. ##44-45, 55-56, 59). The Court will grant summary judgment in favor of these Defendants on Plaintiff's Eighth Amendment claim. Also, the Court will (1) deny Defendant's Partial Motion to Dismiss (Doc. #36) as moot, (2) dismiss Plaintiff's (a) Eighth Amendment claim against the State of Arizona, (b) Ninth Amendment claim, (c) state law medical malpractice claims against the individual defendants, and (d) his request for injunctive relief, and (3) require Plaintiff to show cause why the Doe Defendants should not be dismissed

**I. Procedural History**

In 2002, Plaintiff had a heart defibrillator implanted and was prescribed various medications to regulate his heartbeat. He claimed that while in custody, his defibrillator and

JDDL

medications were not properly monitored, and he filed a lawsuit in the Maricopa County Superior Court.  He sued the following persons in their individual and official capacities:

(1)  Dora Schriro, Director of the Arizona Department of Corrections;

(2)  Ernest Trujillo, Warden at the Lewis Unit of the Arizona State Prison Complex in Buckeye;

(3)  Donald Sloan, Facility Health Care Administrator;

(4)  Dr. Vinluan, prison physician;

(5)  Dr. Bruce Kanter, prison physician;

(6)  "John Does 1-10," "Jane Does 1-10," and "Doe Government Entitles 1-10"; and

(7)  the State of Arizona.

Except for the Doe Defendants, all Defendants were served.  They moved to dismiss, and Plaintiff filed an Amended Complaint.  He set forth six counts and sought declaratory, injunctive and monetary relief.  He claimed that Defendants acted with deliberate indifference in violation of the Eighth Amendment.  He also brought a malpractice claim under state law, as he cited Ariz. Rev. Stat. § 12-562, which is Arizona's provision regarding the grounds for a medical malpractice action, and he certified under Ariz. Rev. Stat. § 12-2602 that expert testimony would be required for a claim against a licensed professional (Am. Compl., ¶¶ 12, 15).

Defendants removed the action to this Court.  They filed a Partial Motion to Dismiss, contending that the State of Arizona and the official-capacity defendants must be dismissed because they are not "persons" for purposes of § 1983 (Doc. #36).  Plaintiff responded with a clarification that he sought monetary damages against the individual-capacity defendants and declaratory and injunctive relief against the official-capacity defendants (Doc. #43).  Defendants replied that their motion was rendered moot by Plaintiff's clarification (Doc. #52).  They did not address whether the State of Arizona was a "person," and the Court has separately addressed this question below.  Regardless, in light of their concession, the Court will deny Defendants' Partial Motion to Dismiss as moot.

1   Plaintiff filed a motion for a preliminary injunction (Doc. #39).  The Court denied his

2   motion as moot because he later received the treatment he had requested (Doc. #85).

3   Defendants Schriro, Trujillo, Sloan, Kanter, and Vinluan filed a Motion for Summary

4   Judgment, which  remains pending (Doc. #44).  Notably, the State of Arizona was not

5   included as a moving party.  See Statement of Facts at 1, Doc. #45.  Hereinafter,

6   "Defendants" refers only to Schriro, Trujillo, Sloan, Kanter and Vinluan.  These Defendants

7   contend that the level of medical care Plaintiff has received did not violate the Eighth

8   Amendment.  In support, they submit the affidavit of Dr. Bruce Kanter, Plaintiff's treating

9   physician and Plaintiff's deposition testimony from September 29, 2005  (Doc. #45, Ex. A-

10   B).  They do not address Plaintiff's malpractice claim, though the Court will address it in the

11   discussion below.

12   Plaintiff responds that disputed issues fact require denial of the motion and in support,

13   he submits his own affidavit (Doc. ##55, 57).  Defendants reply that Plaintiff has failed to

14   show deliberate indifference and in support, they submit Dr. Kanter's supplemental affidavit

15   (Doc. #59, Ex. A).

16   **II. Legal Standards**

17       **A. Summary Judgment**

18   A court must grant summary judgment if the pleadings and supporting documents,

19   viewed in the light most favorable to the non-moving party, "show that there is no genuine

20   issue as to any material fact and that the moving party is entitled to judgment as a matter of

21   law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

22   When considering a summary judgment motion, the evidence of the non-movant is "to be

23   believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty

24   Lobby, Inc., 477 U.S. 242, 248 (1986).  These inferences are limited, however, "to those

25   upon which a reasonable jury might return a verdict."  Triton Energy Corp. v. Square D. Co.,

26   68 F.3d 1216, 1220 (9th Cir. 1995).

27   Rule 56(c) mandates the entry of summary judgment against a party who, after

28   adequate time for discovery, fails to make a showing sufficient to establish the existence of

1   an element essential to that party's case, and on which the party will bear the burden of proof

2   at trial.  Celotex, 477 U.S. at 322-23.  In such a situation, there can be no genuine issue of

3   material fact, since a complete failure of proof concerning an essential element of a

4   nonmoving party's case necessarily renders all other facts immaterial.  Id.

5       **B.  Eighth Amendment**

6        For an Eighth Amendment violation, a prisoner must show that Defendants were

7   deliberately indifferent to his serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 104

8   (1976).  To act with deliberate indifference, a prison official must both know of and disregard

9   an excessive risk to inmate health.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  The

10  official must both be aware of facts from which the inference could be drawn that a

11  substantial risk of serious harm exists and he must also draw the inference.  Id.  This

12  subjective approach focuses upon the mental attitude of the defendant.  Id. at 839.

13       "Deliberate indifference is a high legal standard."  Toguchi v. Chung, 391 F.3d 1051,

14  1060 (9th Cir. 2004).  In the medical context, deliberate indifference may be shown by (1) a

15  purposeful act or failure to respond to a prisoner's pain or possible medical need and

16  (2) harm caused by the indifference.  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006)

17  (citing Estelle, 429 U.S. at 104). Medical malpractice or negligence is insufficient to establish

18  a violation.  Toguchi, 391 F.3d at 1060.  Mere negligence in diagnosing or treating a

19  condition, or an inadvertent failure to provide adequate medical care does not rise to the

20  Eighth Amendment level.  Id. at 1057; Jett, 429 F.3d at 1096.

21       When a prisoner attempts to hold a prison employee responsible for deliberate

22  indifference, the prisoner must establish individual fault.  Leer v. Murphy, 844 F.2d 628, 634

23  (9th Cir. 1988).  Sweeping conclusory allegations will not be sufficient to prevent summary

24  judgment.  Id.  "The prisoner must set forth specific facts as to each individual defendant's

25  deliberate indifference."  Id. at 634.  He must prove that the specific prison official was

26  deliberately indifferent and that this indifference was the actual and proximate cause of the

27  injury.  Id.

28

## III. Analysis

Since 1999, Plaintiff has had heart trouble.  He was diagnosed with cardiomyopathy (when the heart is enlarged), congestive heart failure (when the heart is inefficient at pumping blood), and high blood pressure.  In late December 2002, while in the custody of the county jail, Plaintiff received an Automatic Implantable Cardioverter Defibrillator implant.  The AICD delivers "therapy" by shocking Plaintiff's heart when it beats too slowly or quickly, and the device records these occurrences so medication can be adjusted.  Along with his AICD, Plaintiff was prescribed Amiodarone, an antiarrhythmic to treat irregular heartbeats, and Digoxin, which helps the heart beat strongly and regularly.  These medications have potentially serious side effects.

Plaintiff asserts that his deliberate indifference claim is based on Defendants' failure (1) to properly monitor his AICD every three months as recommended by the manufacturer; (2) to arrange for emergency medical treatment when he suffered an episode of tachycardia in late September 2004; and (3) to monitor his medical condition or to train him to monitor his own condition when taking his medications (Resp. at 2-3).

All of the Defendants are employees of the Arizona Department of Corrections, not the county jail.  Plaintiff became a state prisoner on January 23, 2003, less than a month after his AICD implant.  He was in the ADC's custody until August 2003, when he was remanded to the county jail to face additional criminal charges.  He did not return to ADC custody until eight months later in April 2004, and remained there until his recent release in May 2006.  Defendants presumably were not responsible for Plaintiff's medical care while he was in county custody between August 2003 and April 2004.

### A.  AICD monitoring

Plaintiff's first contention is that Defendants did not properly monitor his AICD.  Plaintiff's treating physician and Guidant, the manufacturer of Plaintiff's AICD, recommended that the AICD be checked every 90 days (Pl.'s Aff. ¶¶ 5-6 and Ex. A, Doc. #57).  Defendants contend that, even assuming that the manufacturer's recommendation is the medically appropriate standard, they substantially complied.

1      The AICD checks required Plaintiff to be transported outside the prison to a
2  pacemaker clinic.  Plaintiff's first check, on March 28, 2003, occurred within the 90-day
3  window after the device was implanted in late December 2002 (Kanter Aff. ¶ 11, Doc. #45;
4  Pl.'s Aff. ¶¶ 9-10).  His next check, on June 27, 2003, took place within the following 90-day
5  window (Kanter Aff. ¶ 12; Pl.'s Aff. ¶¶ 9-10; Sept. 29, 2005 Elmore Dep. ("Pl.'s Dep.") at
6  73, Doc. #45).  When Plaintiff's next check was due – in September 2003 –  he was in
7  custody of the county jail, not the ADC.

8      It is undisputed that the jail's transportation system was stressful on Plaintiff, whereas
9  the ADC's transportation system was not.  While in the jail, Plaintiff refused to go to a check
10  on September 26, 2003, and he wrote on the refusal form that he had a pending legal matter
11  (Kanter Supp. Aff. ¶ 7 and Ex. A, Doc. #59).  Plaintiff later generally asserted, in his
12  Response and at his Deposition, that he refused appointments while in the jail because the
13  transportation system was extremely stressful and if he were being referred for an EMG/NCV
14  test (electromyelogram and nerve conduction study), he thought the procedure might damage
15  his AICD (Pl.'s Aff. ¶¶ 41-42; Pl.'s Dep. at 96-100).  He states that he asked for the
16  appointment to be rescheduled (Pl.'s Dep. at 102-104).

17      His AICD was checked about a month past the 90-day window, on October 31, 2003
18  (Pl.'s Aff. ¶¶ 9-10; Pl.'s Dep. at 108; Kanter Aff. ¶ 13).  Just prior, on October 19, Plaintiff
19  had visited the emergency room for chest and neck pain, and he was told after his release to
20  follow up in one week for an AICD check (Pl.'s Dep. at 104-107).  On October, 21, Plaintiff
21  refused a cardiology appointment because he did not feel well enough to go so soon after his
22  release from the hospital due to the stress in the transportation system, and he told a doctor
23  that he would prefer to wait until he was back in the ADC's custody (Kanter Supp. Aff., Ex.
24  A; Pl.'s Aff. ¶ 42; Pl.'s Dep. at 108).  For the AICD check on October 31, Plaintiff originally
25  did not want to go, but the doctor's office convinced him that he should (Pl.'s Dep. at 108).

26      Plaintiff's next 90-day check was due in January 2004.  He was still in the jail's
27  custody.  During the previous months, in November and December, he had refused to go to
28  several appointments due to the stress in the transportation process (Kanter Aff. ¶ 13; Kanter

Supp. Aff, ¶¶ 4, 7 & Ex. A; Pl.'s Dep. at 111-113).  Plaintiff refused another cardiology appointment on January 6, 2004, again noting the stress was too much for his heart (Kanter Aff. ¶ 13; Kanter Supp. Aff. ¶ 7 & Ex. A).  He refused another appointment on February 27 and wrote on the form that he would wait until he was returned to the ADC because their transportation system was not as stressful on his heart (Kanter Aff. ¶ 13; Kanter Supp. Aff. ¶ 7 & Ex. A).  Plaintiff's AIDC was checked in late February (Kanter Aff. ¶ 13; Pl.'s Aff. ¶¶ 9-10).  This was about a month past the recommended time, and he was still in the jail's custody.

Plaintiff refused another cardiology appointment on March 30 due to the stress in the transportation process (Kanter Aff. ¶ 13; Kanter Supp. Aff. ¶ 7 and Ex. A; Pl.'s Aff. ¶ 42).  On April 22, 2004, he was returned to the state prison.

Under the 90-day window, Plaintiff was due for another AIDC check in late May 2004.  He was scheduled for June 22, and Dr. Kanter noted that he was overdue (Pl.'s Dep. at 130-31).  This appointment apparently was missed.  Plaintiff admitted that Dr. Kanter had been actively following up and scheduling pacemaker appointments, but Plaintiff also said that the scheduled appointments would be bypassed unless he again reminded Dr. Kanter.  Kanter would then become upset and make a phone call to someone to ask why Plaintiff was not going to the pacemaker clinic.  Plaintiff would go, but the same thing would happen again for the next appointment.  Id. at 131-32.

On the 5th of August, Plaintiff submitted a health needs request stating that his pacemaker had not been checked in six months, and he admitted that the delay was caused by his refusal to have it checked while in the jail's custody (Pl.'s Dep. at 132).  Plaintiff's AICD was checked in late August (Kanter Aff. ¶ 14; Pl.'s Dep at 132-33; Pl.'s Aff. ¶¶ 9-10).  Given that his last check was in February, this appointment was about three months past due.

Plaintiff's next AICD check was due in late November, but before then, he suffered two syncopal (fainting or lightheadness) episodes in late September and early October.  The second one resulted in his hospitalization, where his AICD was checked on October 3

1    (Kanter Aff. ¶ 6).  It was functioning properly.  The AICD was again checked on October

2    28 in response to a health needs request.  Id. ¶ 8.

3          Given the early AICD checks on October 3 and 28, 2004, Plaintiff's next check was

4    due in late January 2005.  A check was made on February 17, 2005, shortly outside the

5    90-day window (Pl.'s Aff. ¶ 9).  Another check was made on April 6, 2005, well within the

6    next 90-day timeframe (Kanter Aff. ¶ 15; Pl.'s Aff. ¶ 9).  The record shows that the last

7    check was 3 months later, on July 6, 2005 (Kanter Aff. ¶ 16).

8          As a final note, Plaintiff claims that at the checks, his AICD was adjusted, whereas

9    Defendants contend that the AICD was functioning normally (Pl.'s Aff. ¶¶ 9-10; Kanter Aff.

10   ¶¶ 8, 11-16).  These statements do not create a disputed issue of fact, as it is possible that the

11   AICD was functioning normally and also required adjustments.  Even if there is a disputed

12   fact issue as to what occurred at the checks, it is not material to the question of deliberate

13   indifference.  There is nothing to show that any of the Defendants actually performed the

14   AICD checks but rather, Plaintiff was referred to a pacemaker clinic where the checks were

15   performed.

16         In sum, in light of this record, no reasonable jury could infer that Defendants acted

17   with deliberate indifference.  Even assuming that the 90-day window for AICD checks is the

18   medically acceptable standard, while in the custody of the ADC, Plaintiff received checks

19   within this window every time except twice.  On one occasion (August 2004), the check was

20   three months late, but as Plaintiff testified in his deposition, there was a scheduling problem

21   that Dr. Kanter actively attempted to fix.  At most, these circumstances show negligence by

22   the person who handled the scheduling, and not deliberate indifference on the part of Dr.

23   Kanter.  On the other occasion of the missed check in February 2005, the check was just a

24   few days outside the 90-day window.  This is insignificant, particularly in light of the record

25   showing that the remaining checks regularly took place.  Moreover, there are no allegations

26   regarding the conduct of any Defendants except Dr. Kanter, and Plaintiff admitted that

27   Kanter actively followed up for him.  Defendants are therefore entitled to summary judgment

28   on part of Plaintiff's claim.

**B.  Emergency medical treatment on September 29, 2004**

Plaintiff contends that Defendants were deliberately indifferent by failing to send him for emergency treatment when he suffered his first syncopal episode on September 29, 2004. The evidence in the record would not permit a reasonable jury to make the inference that Defendants were deliberately indifferent.

Shortly before Plaintiff's syncopal episode, in late August, Plaintiff's AICD was checked.  On September 1st, an Echo cardiogram was requested to determine ejection fraction (a measurement of heart's efficiency) to estimate Plaintiff's life expectancy (Kanter Aff. ¶ 18).  Then, on September 29, Plaintiff suffered tachycardia (rapid heart beat) which caused him to faint. Id. ¶ 5.  Plaintiff asserts that the episode "only resulted in my placement at the complex medical unit so that my vitals could be taken, an EKG performed and [for me to be] returned to the prison population without observation by medically trained personnel." (Pl.'s Aff. ¶ 27).  He admits, however, that either a nurse or physician assistant gave him the EKG. Id. ¶¶ 23, 25.  Defendants contend that the EKG revealed nothing significant (Kanter Aff. ¶ 18).

On the next day, September 30, he was seen by Dr. Kanter, who diagnosed him with a syncopal episode (fainting or lightheadedness) (Kanter Aff. ¶ 5).  He was also prescribed Amiodarone (Pl.'s Aff. ¶ 13).  Although staff scheduled Plaintiff to see a cardiologist on November 19th, Dr. Kanter requested that the appointment be moved up to the next available date because he thought the appointment was too far off (Kanter Aff. ¶ 5).  But Plaintiff asserts that there is no documentation to suggest that Kanter sought to have the appointment moved up to an earlier date, or that an appointment had been approved for the 30th (Pl.'s Aff. ¶ 38).

It is undisputed that Dr. Kanter was unable to act before Plaintiff suffered a second syncopal episode.  On October 3, Plaintiff was sent for an emergency admission to Maricopa Medical Center (Kanter Aff. ¶ 6; Pl.'s Aff. ¶ 26).  Plaintiff underwent a comprehensive cardiac and AICD evaluation (Kanter Aff. ¶ 6).  During that time, his tests included (1) an EKG that showed ST depression and positive premature ventricular contractions; (2) a chest

x-ray that showed no changes from previous films; and (3) an AICD check which showed proper functioning. Id. ¶ 18.  Plaintiff was given two big bottles of Amiodarone because he did not have enough in his system (Pl.'s Dep. at 144-45).  He was discharged on October 7, 2004, and seen by Dr. Kanter on his return to the prison.

Plaintiff admits that when he suffered the first episode, he was attended by a nurse or a physician's assistant.  He does not assert any facts to show that when the incident occurred, any of the Defendants were present.  Thus, it was impossible for them to have been deliberately indifferent at the time of the incident because they were not aware of any facts from which they could have drawn the inference that there was a substantial risk to Plaintiff's health.  Plaintiff has not identified the nurse or physician's assistant who he believes should have sent him to the emergency room, so the Court cannot at this time consider a claim that an unidentified person was deliberately indifferent.

Plaintiff was seen by Dr. Kanter the day after the first episode, and Dr. Kanter diagnosed him with a syncopal episode and had his staff schedule a cardiology appointment for Plaintiff.  Plaintiff asserts that when the appointment was set too far out, Dr. Kanter did not try to have it moved up, and that Dr. Kanter should have sent him to the emergency room.  Even viewing the evidence in the light most favorable to Plaintiff, he still has not shown that Dr. Kanter exhibited deliberate indifference.  Dr. Kanter saw Plaintiff, prescribed medication, and referred him to a cardiologist.  At most, Dr. Kanter's failure to have the appointment moved up or to send Plaintiff for further testing was negligence, which does not rise to the Eighth Amendment level.  Plaintiff has not described exactly what should have been done by Dr. Kanter, nor has he submitted any evidence to identify what the medically acceptable practice should have been in this situation.  On this record, no reasonable jury could infer that Dr. Kanter was deliberately indifferent.

**C. Medical monitoring**

Plaintiff asserts that Defendants failed to monitor his medical condition or to train him to monitor his own condition.  He asserts that his condition required monitoring for progress and side effects, including "pulse, blood pressure, temperature and/or periodical laboratory

1   and/or medical tests (e.g., liver test, EKG, chest x-rays, eye exams, etc.)" (Am. Compl. ¶ 23).

2   Plaintiff relies on Patient Drug Education Reports (PDER) as the standard for the type of

3   monitoring that is required.  Because he takes Amiodarone, he expected that regular testing

4   would include "an EKG, chest x-rays, lung tests, liver tests, thyroid tests and eye exams" and

5   possibly "daily pulse rate checks" (Pl.'s Aff. ¶ 18).  For Digoxin, he expected "additional

6   monitoring" when taken in conjunction with Amiodarone. Id., ¶ 19.  Plaintiff asserts that he

7   received less than the regularly required tests because he was viewed as a complainer and

8   hypochondriac. Id. ¶¶ 22, 30, 32.  Plaintiff admits that he does not have access to an expert

9   opinion regarding the lack of monitoring (Resp. at 18).

10   Defendants assert that the PDERs are not treatment protocols and instead, physicians

11   determined which tests were needed based on Plaintiff's symptoms (Kanter Aff. ¶ 17).

12   Defendants assert that Plaintiff has not identified what additional testing was needed, and he

13   was seen on a regular basis (Kanter Supp. Aff. ¶ 5).  According to Dr. Kanter, daily

14   monitoring of Plaintiff's heart rate, as recommended in the PDER, does not apply to persons

15   with an AICD, because the AICD is designed to accurately monitor heart rate. Id. ¶ 8.

16   Defendants also assert that Plaintiff did not follow recommendations regarding his

17   Amiodarone and refused to keep several medical appointments.

18   **1. Amiodarone**

19   When he received his AICD, Plaintiff was prescribed Amiodarone, an a medication

20   to treat irregular heartbeats.  Plaintiff submitted a PDER, which provides the following

21   information about the drug:

22   Amiodarone should be used under close clinical supervision.  A response may
     not be seen until up to 3 weeks after the medicine is started.  Amiodarone stays
23   in your body for weeks or months, even after you are no longer taking it.
     Therefore, caution is advised not only during treatment, but for several months
24   after Amiodarone treatment has stopped, if you are taking any medicines that
     may interact with it. . . .
25
     ADDITIONAL MONITORING OF YOUR DOSE OR CONDITION may be
26   needed if you are taking "blood thinners" (e.g., . . . digoxin. . . ) . . . .

27   CAUTIONS: IT MAY TAKE SEVERAL DAYS TO WEEKS for the
     medicine to work.  DO NOT STOP TAKING this medicine or change the dose
28   without checking with your doctor.

JDDL                                      - 11 -

1   SIDE EFFECTS that may occur while taking this medication include
2   constipation, loss of appetite, bitter taste in mouth, nausea, vomiting, dizziness,
    trouble sleeping, headache, flushing of the face, or decreased sexual interest
3   . . . CONTACT YOUR DOCTOR IMMEDIATELY if you experience
    coldness, sweating, unexplained weight change, enlarged thyroid gland,
4   nervousness, uncontrolled shaking or tremor, sluggishness, loss of
    coordination, tingling or numbness of hands or feet, irregular pulse, vision
    changes (e.g., seeing halos, blurred vision, or loss of vision), easy bruising or
5   bleeding or persistent sore throat.

6   (Pl.'s Aff., Ex. B).  Dr. Kanter asserts that the Physician's Desk Reference provides that

7   Amiodarone is the only medication effective in treating Plaintiff's type of arrhythmia (Kanter

8   Aff. ¶ 20).  Because individual response varies considerably, experimentation with the

9   dosage level may be required.  Id.  ¶ 23.

10      Plaintiff's initial dosage level of Amiodarone was 400 mg.  In late April or early May

11  2003, he experienced numbness in his arms and hands that he thought were side effects of

12  his medication.  He saw Defendant Dr. Vinluan.  At that time, Plaintiff's Digoxin levels were

13  fine, and the record does not show whether his Amiodarone levels were checked.

14  Regardless, Dr. Vinluan diagnosed Plaintiff with carpal tunnel syndrome in light of

15  Plaintiff's previous experience as a drummer.  Plaintiff also reported that he had blurry

16  vision, and Dr. Vinluan referred him for an eye exam.  Dr. Vinluan instructed Plaintiff to

17  make a health needs request if his symptoms continued (Am. Compl. ¶¶ 24-27; Pl.'s Dep. at

18  53-70).  Plaintiff went to the eye appointment, and told the person administering the tests that

19  he did not need glasses because his vision was changing, possibly from the medication.

20  Plaintiff refused the remaining tests, and his eyes were never examined (Kanter Aff. ¶ 18;

21  Pl.'s Dep. at 66-67).

22      In early July, Plaintiff submitted a health needs request for tremors and numbness in

23  his hands and arms.  He was seen by Dr. Vinluan (Pl.'s Dep. at 73-74, 77).  Later in July,

24  Plaintiff experienced the same symptoms, magnified by the loss of coordination in his hands

25  and arms, and he made another health needs request.  Id. at 79.  Dr. Vinluan made a referral

26  for an EMG/NCV (electromyelogram and nerve conduction study) to rule out neuropathy

27  (abnormal state of the nervous system) or radiculopathy (pathology of the nerve roots)

28  (Kanter Supp. Aff., ¶ 4).

Plaintiff was in the jail's custody beginning in August 2003.  At his deposition, Plaintiff testified that he was taken off Amiodarone for a few weeks and then returned to a reduced level of 200 mg. (Pl.'s Dep. at 93-94).  His tremors stopped, his vision improved, and his coordination returned, though he still had difficulty with two of his fingers and general achiness in his hands.  Id. at 94-95.  In his affidavit, Plaintiff stated that in January 2004, he self-adjusted his dosage of Amiodarone in half to reduce the side effects and began making a personal journal of the effects (Pl.'s Aff. ¶ 14).  He also asserts that he informed his treating physician in the hopes of getting proper instruction on how perform self-checks, including his pulse and blood pressure, so that he could get the proper dosage level (Pl.'s Aff. ¶ 15).

On October 19, 2003, Plaintiff was sent to the emergency department after he complained of chest and neck pain.  He told the emergency personnel that he had been having chest pains for four days.  Plaintiff stated that he had been taken to the hospital at least ten times for similar complaints.  On October 19, 2003, he was returned to the jail and instructed to continue his medications and to follow up in one week for an AICD check (Pl.'s Dep. at 104-106).

In April 2004, Plaintiff was returned to the state prison through the reception unit in Alhambra and then transferred to the Lewis Unit in Buckeye on May 6, 2004 (Pl.'s Dep. at 120).  In his affidavit, Plaintiff asserts that on April 29, apparently while at Alhambra, a physician named Dr. Tee took him off Amiodarone, and Plaintiff did not take it again until after his syncopal episode in fall 2004 (Pl.'s Aff. ¶ 13).  At his deposition, however, Plaintiff testified that on May 7, he obtained a refill of his heart medications, including 200 mg of Amiodarone (Pl.'s Dep. at 121).

Plaintiff testified that while in ADC custody, he self-adjusted his Amiodarone to half the level because he was shaking again (Pl.'s Dep. at 122-23).  According to Dr. Kanter, on January 4, 2005, Plaintiff submitted a health needs request stating that he had lowered his Amiodarone on his own (Kanter Aff. ¶ 9; Pl.'s Dep. at 122-23).  Dr. Kanter asserts that he stressed the importance of taking medication as prescribed (Kanter Aff. ¶ 9).  Plaintiff

1   admitted that he was told that if he stopped taking them, he would die, so he started taking

2   them again (Pl.'s Dep. at 123).

3        On February 3, 2004, Dr. Kanter again cautioned Plaintiff about self-adjusting his

4   medication (Kanter Aff. ¶ 15).  Defendants contend that on the 17th, it was discovered that

5   Plaintiff was hoarding 54 Amiodarone pills and 145 Carvedilol pills.  Id. ¶ 10.  Plaintiff

6   disputes that he "hoards" medications (Pl.'s Aff. ¶ 46).  He asserts that he was issued "keep-

7   on-person" medications and about an hour after he received his, he noticed that they seem

8   excessive.  Id. ¶ 44.  He was informed by security staff to discuss the matter at pill call.  Id.

9   He showed the pills to Corrections Officer II Kendall, and the excessive amount was returned

10  to medical personnel to be taken back to the pharmacy.  Id., ¶ 45.  On October 28, Plaintiff

11  reported to Dr. Kanter that he was doing well on a lower dosage of Amiodarone (Kanter Aff.

12  ¶ 8).

13       Viewing the evidence in the light most favorable to Plaintiff, it is plain that the correct

14  dosage level of Amiodarone is not an exact science.  When Plaintiff saw Dr. Vinluan for

15  numbness, in spring 2003, it is possible that Dr. Vinluan failed to recognize Plaintiff's

16  symptoms as side effects of the medication.  There is nothing to show that Dr. Vinluan's

17  actions, however, were anything more than negligence.  Dr. Vinluan diagnosed Plaintiff with

18  carpal tunnel syndrome, and Plaintiff admits that he still suffers general hand achiness and

19  problems with two fingers, even after his Amiodarone dosage level was reduced.  Dr.

20  Vinluan also referred Plaintiff to an optometrist to check his eyes, and Plaintiff decided not

21  to complete the appointment.  Even if a reasonable jury could find that Dr. Vinluan's

22  diagnosis was incorrect, a reasonable jury could not find that he acted with deliberate

23  indifference.

24       Also, even assuming that Plaintiff was improperly given excessive amounts of

25  Amiodarone that he returned to the pharmacy, Plaintiff has admitted that he self-regulated

26  his dosage level and that Dr. Kanter told him it was important to take his medication.  There

27  is nothing in the record to support that Dr. Kanter, or any other Defendant, acted with

28  deliberate indifference regarding Plaintiff's Amiodarone dosage level.

### 2.  Other medical care

Other than the medical care discussed in the foregoing, the record is replete with examples of medical attention that Plaintiff received while in the custody of the ADC.  Upon admission in January 2003, he had a chest x-ray and a blood test that showed normal liver function (Kanter Aff. ¶ 18; Pl.'s Aff. ¶ 23).  Plaintiff made three health needs requests (January 27th, 29th and February 1st) stating that his AICD had delivered therapy, but these turned out to be imaginary, as the AICD checked out normally  (Pl.'s Dep. at 50-51).  In April 2003, he was seen by Dr. Vinluan when he complained of neck pain that he thought was a stroke (Pl.'s Dep. at 51-53).  He had blood tests that showed that his Digoxin levels were normal (Kanter Aff. ¶ 18; Pl.'s Aff. ¶ 23).

From August 2003 until April 2004, Plaintiff was in the custody of the county jail.  He frequently refused medical appointments, including AICD checks, primarily due to the stress imposed by the transportation process.  He states that his treating physician told him that an EMG/NCV could pose a danger to his AICD, so he did not get that test (Pl.'s Aff. ¶ 36).  Although Defendants contend that they researched the question and found no risk (Kanter Supp. Aff. ¶ 4), they do not dispute that the EMG was never performed.  On the 26th of September, an x-ray showed that Plaintiff had degenerative disc disease (arthritis) (Pl.'s Dep. at 100-101).

On the 24th of May 2004, Plaintiff was seen by Dr. Kanter for neck pains (Pl.'s Dep. at 127).  Dr. Kanter checked his lungs and heart and ordered a mattress wedge for shortness of breath Plaintiff was experiencing at night (Pl.'s Dep. at 128).

In mid-June, Plaintiff broke his foot (Pl.'s Dep. at 130).  He apparently received treatment, as there are no allegations that his broken foot was ignored.  He had been pre-approved to go to the pacemaker clinic on the 22nd, and Dr. Kanter noted that he was overdue for his appointment (Pl.'s Dep. at 130).  On the 20th of July, Plaintiff's SGPT (liver enzyme) was normal (Kanter Aff. ¶ 18).  On September 1st, an Echo cardiogram was requested to determine ejection fraction (a measurement of heart's efficiency) to estimate Plaintiff's life expectancy.  Id.

Without being asked by Plaintiff, Dr. Kanter submitted a letter signed on September 13 for a hearing on Plaintiff's request for clemency, based on the immediate risk of death given his heart condition (Pl.'s Dep. at 135-36). The letter states:

> Offender Elmore has an implantable defibrillator pacemaker. He has congestive heart failure. He is taking several cardiac medications. His heart is working at a severely diminished capacity. His prognosis remains highly at risk for sudden death at any time; certainly within the next six months.

(Pl.'s Aff., Ex. D).

After Plaintiff's snycopal episodes in late September and early October 2004, he was prescribed Amiodarone (Pl.'s Dep. at 144-45). On October 17, Plaintiff reported that he thought the AICD had shocked his heart (Kanter Aff. ¶ 7). On the 18th or 19th, Dr. Macabuhay performed an EKG and continued his medications (Kanter Aff. ¶ 7; Pl.'s Aff. ¶ 23). The EKG indicated that Plaintiff had ventricular tachycardia, or an advanced heart rate (Kanter Aff. ¶ 18). On October 28, 2004, Dr. Kanter evaluated Plaintiff in response to a health needs request (Kanter Aff. ¶ 8).

On February 17 and April 6, 2005, Plaintiff had appointments at the cardiac clinic (Pl.'s Aff. ¶ 9). On May 19, 2005, Plaintiff had an EKG which revealed a mild ST elevation that was indicative of his known heart disease (Kanter Aff. ¶ 18). On June 20, 2005, Plaintiff's blood was evaluated (Kanter Aff. ¶ 18; Pl.'s Aff. ¶ 23). No Amiodarone was detected, but Digoxin was. Id. His liver function was normal, and no thyroid tests were taken. According to Defendants, no symptoms indicated that one was necessary. Id.

In sum, Plaintiff had not identified what other medical care he needed and when he needed it. Given the extensive medical care he received, no reasonable jury could find that his physicians were deliberately indifferent to his medical needs.

**D. Summary**

In sum, the record does not permit a reasonable jury to infer that any of the Defendants were deliberately indifferent to Plaintiff's serious medical needs. The evidence does not establish that the Defendant who was most involved in Plaintiff's medical care – Dr. Kanter – was deliberately indifferent. Moreover, Plaintiff admitted that he and Dr. Kanter enjoyed a good relationship, and that Dr. Kanter purposely scheduled Plaintiff for an

appointment at the end of the day so they could chat (Pl.'s Dep. at 131). Dr. Kanter voluntarily supported Plaintiff's request for clemency based on his medical condition (Pl.'s Dep. at 136). As Defendants submit, at his deposition, Plaintiff agreed to stipulate to dismiss Dr. Kanter:

> Q:   Do you agree or disagree that Dr. Kanter should be named as a defendant in this lawsuit in which you're claiming that he was deliberately indifferent to your serious medical needs?
>
> A.   I disagree. I'm going to be honest with you.
>
> Q.   Do you think Dr. Kanter has shown concern for you medical needs?
>
> A.   Yes.
>
> Q.   Are you willing to dismiss the claim against Dr. Kanter, drop him out of this lawsuit?
>
> A.   Yes.
>
> Q.   If I prepare a stipulation to that, would you sign it?
>
> A.   Yes.
>
> Q.   And I'm not saying anything to intimidate you at this point, or persuade you?
>
> A.   No. I disagreed with this. I didn't do this, someone else did. I disagreed with him on that.

(Pl.'s Dep. at 137-38).

Regarding Dr. Vinluan, the record shows only that Plaintiff believed he was suffering side effects from Amiodarone and disagreed with Vinluan's diagnosis of carpal tunnel syndrome. Even assuming Plaintiff's diagnosis is the correct one, he has not shown deliberate indifference, given that Vinluan checked his blood levels, referred him to an optometrist, and told him to make another request if the symptoms continued.

In addition, it is unclear how Defendants ADC Director Schriro, Warden Trujillo, and Health Administrator Sloan were deliberately indifferent. In his Amended Complaint, Plaintiff alleges that these defendants, as supervisors and policymakers, owed a duty of providing reasonable medical care (Am. Compl., ¶¶ 2-4). According to Plaintiff, "upon information and belief," Defendants Schriro, Trujillo and Sloan have a policy requiring authorization for a physician before calling for an emergency medical transport (Am. Compl.,

¶ 33).  The record, however, does not reveal any facts to show how these Defendants were deliberately indifferent.  Although Plaintiff's allegations sufficiently stated a claim, they do not defeat Defendants' summary judgment motion.

**IV.    Miscellaneous Claims**

After this action was removed, it was not screened under the Prison Litigation Reform Act.  The Court may screen it for failure to state a claim, frivolousness, maliciousness, and for claims brought against immune defendants.  See 42 U.S.C. § 1997e(c); 28 U.S.C. § 1915A.  After screening, the Court will dismiss the following claims.

**A. Eighth Amendment claim against the State of Arizona**

Section 1983 applies to every "person" who, while acting under color of state law, subjects another to the deprivation of constitutional rights.  A State is not a "person" for purposes of § 1983.  Will v. Michigan Dept. of State Police, 491 U.S. 58, 69-71 (1989). Plaintiff therefore cannot bring an Eighth Amendment claim against the State of Arizona.

**B. Ninth Amendment**

In his Amended Complaint, Plaintiff also relied upon the Ninth Amendment.  The Ninth Amendment provides that "the enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."  The Ninth Amendment "has never been recognized as independently securing any constitutional right, for purposes of pursuing a civil rights claim."  Strandberg v. City of Helena, 791 F.2d 744, 748-49 (9th Cir. 1986); see also San Diego County Gun Rights Committee v. Reno, 98 F.3d 1121, 1125 (9th Cir. 1996) (collecting authorities rejecting the Ninth Amendment as independently securing constitutional rights).  Instead, a civil rights claim must be based on a specific constitutional guarantee.  Strandberg, 791 F.2d at 749 (collecting United States Supreme Court authorities).  Plaintiff's reliance on the Eighth Amendment is sufficient for his claims. His Ninth Amendment claim will be dismissed for failure to state a claim.

**C. Medical malpractice against Named Defendants**

Defendants Schriro, Trujillo, Sloan, Kanter and Vinluan have been sued for medical malpractice, which is a state law tort.  Under Arizona law, however, "[a]ny and all causes of

1  action which may arise out of tort caused by the director, prison officers or employees of the

2  department [of corrections], within the scope of their legal duty, shall run only against the

3  state." Ariz. Rev. Stat. § 31-201(E). While individual corrections officers may not be sued

4  for actions taken within the scope of their legal duties, the State remains fully liable for the

5  torts of its employees. Howland v. State, 818 P.2d 1169, 1173 (Ariz. Ct. App. 1991). Thus,

6  the Court will dismiss the medical malpractice claim against the individual Defendants who

7  have been served (but not as to the State of Arizona).

8        **D. Injunctive Claims**

9        In part, Plaintiff seeks injunctive relief for his medical care. Plaintiff has been

10  released from prison since filing his action (Doc. ##90-91). Any request for injunctive relief

11  is therefore moot, absent any expectation that he will be re-incarcerated. Preiser v. Newkirk,

12  422 U.S. 395, 402-403 (1975); Johnson v. Moore, 948 F.2d 517, 519 (9th Cir. 1991) (*per*

13  *curiam*). The record reflects no such expectation, so the injunctive relief claims will be

14  dismissed as moot.

15  **V.  Eleventh Amendment Immunity**

16        The Court further finds that the Defendant State of Arizona has waived Eleventh

17  Amendment immunity for the remaining state law medical malpractice claim by removing

18  this action. The Court may raise Eleventh Amendment sovereign immunity sua sponte. In

19  re Jackson, 184 F.3d 1046, 1048 (9th Cir. 1999). Normally, Eleventh Amendment immunity

20  bars suits in federal court against a state and its agencies brought by its own citizens and

21  citizens of other states. In this action, however, Defendant State of Arizona waived

22  sovereign immunity by removing from state court to this federal court. See, e.g., Lapides v.

23  Board of Regents of University System, 535 U.S. 613 (2002) (only valid claim against state

24  was a state law claim, and State waived immunity when it removed these claims from state-

25  court proceedings); see also Embury v. King, 361 F.3d 562 (9th Cir. 2004) (denying State's

26  motion to dismiss on immunity grounds when it had removed action). As aptly put by the

27  Ninth Circuit, "[a]llowing a state to waive immunity to remove a case to federal court, then

28  "unwaive" it to assert that the federal court could not act, would create a new definition of

1   chutzpah." Embury, 361 F.3d at 566.  Thus, because the State of Arizona waived immunity

2   by removing the action, the Court may consider the malpractice claim against it.

3   **VI. Show Cause**

4   In light of the foregoing, Plaintiff's remaining claims are:  (1) constitutional and state

5   law claims against Doe Defendants who have not been served; and (2) medical malpractice

6   claims against the State of Arizona.  The Court will require Plaintiff to show cause why the

7   Doe Defendants ("John Does 1-10, Jane Does 1-10 and Doe Government Entities 1-10")

8   should not be dismissed.

9   Generally, the use of anonymous type appellations to identify defendants is not

10  favored.  Rule 10(a) of the Federal Rules of Civil Procedure requires the plaintiff to include

11  the names of the parties in the action.  None of the Doe Defendants were served before or

12  after removal of this action.  Indeed, it is virtually impossible to serve Doe Defendants

13  because of their anonymity.

14  The Ninth Circuit has held that where identity is unknown prior to the filing of a

15  complaint, the plaintiff should be given an opportunity through discovery to identify the

16  unknown defendants, unless it is clear that discovery would not uncover the identities, or that

17  the complaint would be dismissed on other grounds.  Wakefield v. Thompson, 177 F.3d

18  1160, 1163 (9th Cir. 1999) (citing Gillespie v. Civiletti, 629 F.2d 637, 642 (9th Cir. 1980)).

19  There has been sufficient opportunity for discovery in this action, and Plaintiff has not sought

20  to amend his complaint to identify the Doe Defendants.  He will therefore be required to

21  show cause within 30 days why these Doe Defendants should not be dismissed without

22  prejudice.  To comply, Plaintiff must file a Response explaining why these Defendants

23  should not be dismissed.  If he fails to do so, they will be dismissed.

24  **IT IS ORDERED:**

25  (1)  Defendants' Partial  Motion to Dismiss (Doc. #36) is **denied** as moot.

26  (2)  Defendants' Motion for Summary Judgment (Doc. #44) is **granted**.  Plaintiff's

27  Eighth Amendment claims against Defendants Schriro, Trujillo, Sloan, Vinluan, and Kanter

28  are **dismissed** with prejudice.

1      (3) The following claims are dismissed for failure to state a claim: (a)  Plaintiff's

2 Eighth Amendment claim against the State of Arizona; (b) Plaintiff's Ninth Amendment

3 claim; (c) Plaintiff's medical malpractice claim against Schriro, Trujillo, Sloan, Vinluan, and

4 Kanter; and (d) Plaintiff's request for injunctive relief.

5      (4) Defendants Schriro, Trujillo, Sloan, Vinluan and Kanter are dismissed because no

6 claims remain against them.  The remaining Defendants are the State of Arizona and the Doe

7 Defendants.

8      (5)  Within 30 days of the date of entry of this Order, Plaintiff must show cause why

9 the remaining Doe Defendants should not be dismissed without prejudice.

10      DATED this 4th day of August, 2006.

                                   Mary H. Murguia
                                   United States District Judge